UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EDWARD J. KWITEK,

        Plaintiff,

        -vs-                        07-CV-826-JTC

UNITED STATES POSTAL SERVICE, and
UNITED STATES OF AMERICA,

        Defendants.

_____

APPEARANCES:   ARTHUR J. ZILLER, ESQ., Buffalo, New York, for Plaintiff.

                  WILLIAM J. HOCHUL, JR., UNITED STATES ATTORNEY FOR THE
                  WESTERN DISTRICT OF NEW YORK (MARY PAT FLEMING, ESQ.,
                  and KEVIN D. ROBINSON, ESQ., Assistant United States Attorneys,
                  of Counsel), Buffalo, New York, for Defendants.

## <u>MEMORANDUM OF DECISION</u>

Plaintiff Edward Kwitek filed this action on December 14, 2007, against the United

States of America and the United States Postal Service ("USPS") pursuant to the Federal

Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680, for money damages based

on personal injuries he allegedly sustained in October 2005 while loading containers of

mail at the LaSalle Post Office Station in Niagara Falls, New York.  Following discovery,

and after referral of the case for mediation pursuant to the court's alternative dispute

resolution plan, the court placed the matter on the calendar for a bifurcated non-jury trial

on the issue of liability to commence on September 2, 2009.

On the eve of trial, the government filed a motion to dismiss the complaint for lack

of subject matter jurisdiction based on the "independent contractor" and "discretionary

function" exceptions to the FTCA's limited waiver of sovereign immunity. The court heard oral argument of the motion on September 1, 2009, and reserved decision, allowing the two-day liability trial to proceed as scheduled the next day.

On February 18, 2010, this court entered its decision and order (Item 51) denying the government's motion to dismiss, finding that neither exception to the FTCA's waiver of immunity applied under the circumstances presented in this case. *See Kwitek v. U.S. Postal Service*, 694 F. Supp. 2d 219 (W.D.N.Y. 2010). The court then referred the matter to a United States Magistrate Judge for one final attempt to settle the case, but this was unsuccessful.

The court therefore now makes the following findings of fact and conclusions of law on the issue of liability, in accordance with Rule 52 of the Federal Rules of Civil Procedure.[1]

## FINDINGS OF FACT

In October 2005, plaintiff was working as a driver for Midwest Transport, Inc. ("Midwest Transport"), an independent trucking company hired by the USPS under a

_____

[1]Rule 52 states in relevant part:

In an action tried on the facts without a jury . . . , the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or a memorandum of decision filed by the court. Judgment must be entered under Rule 58.

Fed. R. Civ. P. 52(a). While "punctilious detail" is not required, *In re Mazzeo*, 167 F.3d 139, 142 (2d Cir.1999) (internal quotation marks omitted), the court must set forth its findings and conclusions sufficiently to permit meaningful appellate review. *See, e.g., United States v. Sasso*, 215 F.3d 283, 292 (2d Cir. 2000).

3,700-plus page "Transportation Services Contract" (Ex. 44)[2] to transport mail between postal facilities in Buffalo, Grand Island, and Niagara Falls, New York. Plaintiff claims that he sustained severe injuries to his back and spine when, on October 19, 2005, "he was forced to maneuver two large bins of mail onto his truck without assistance from defendants' personnel and without being provided appropriate equipment" at the LaSalle Station loading dock. Item 1, ¶ 9.

The facts relating to this claim were developed through the presentation of testimony and related exhibits at the non-jury trial held on September 2-3, 2009. Plaintiff testified, and offered the testimony of former USPS employees C.C. Cox, Jr. and John Sullivan. The government offered the testimony of USPS employees Steven Simpson, Janine Egloff, and Brendan Shea, along with the testimony of plaintiff's supervisor at Midwest Transport, Robert Straker. A summary of these witnesses' trial testimony follows.

**1.      Plaintiff Edward Kwitek**

Plaintiff was born in Buffalo and grew up in Lackawanna, New York. He was 52 years old at the time of trial. He worked at several jobs over the years, including 21 years at a company known as Connex, which made and sold thermal coupling and heat sensing devices. He began working for Midwest Transport in July 2003, and had been assigned to the Buffalo/Grand Island/LaSalle route for approximately two years prior to October 2005, when his injury allegedly occurred (Tr. 6-9).[3]

---

[2]Numerical references preceded by "Ex." are to the trial exhibits, submitted to the court as "Joint Exhibits" 1-47, and admitted as evidence by agreement of the parties entered on the record at the close of trial.

[3]Numerical references preceded by "Tr." are to pages of the trial transcript, entered on the court's docket as Items 44 & 45.

Plaintiff's normal routine included three trips each day along the route, five days a week. His work day started at around 11:30 a.m. at the Midwest Transport truck yard in Buffalo, where he would "pretrip" his truck by checking the fuel, oil, tires, fluids, brakes, and other operating components before heading to the Buffalo Post Office. There he would back his truck into an assigned loading dock and pick up a trailer loaded with mail for delivery to Grand Island and Niagara Falls. At the first stop on Grand Island, he would ordinarily pick up a small white mail basket, which he placed on the trailer himself. He would then proceed to the LaSalle Station, usually arriving there around 1:20 p.m. on the first run (Tr. 10-14).

Upon arriving at the LaSalle Station, plaintiff would back his tractor-trailer into an available loading dock, unhook the tractor from the trailer, and pull around to another dock to hook up to a different trailer which the dock handler, C.C. Cox, had already loaded with the mail to be taken back to Buffalo. He testified that during the two years he had worked for Midwest Transport on this particular route, C.C. Cox or other USPS employees always had the return trailer loaded. Plaintiff never had to load the mail himself (Tr. 14-19).

Once the new trailer was hooked up and the load secured, plaintiff would once again "pretrip" the tractor-trailer to make sure it was ready for the return trip. The written time schedule (*see* Ex. 2) allowed for 20 minutes from arrival to departure to accomplish all of these tasks at the LaSalle Station. According to plaintiff, it was within his discretion to ask for a late slip so that he could still get paid if the mail was delayed, but the Post Office was reluctant to give out late slips if the delay was their fault (Tr. 19-24).

At trial, plaintiff could not specifically recall what day of the week the incident at issue occurred on, but he knew it was during the week of October 19, 2005. He testified

that when he arrived at the LaSalle Station on his first run that day, everything was dark in the loading dock area, and there were no USPS employees around. He looked inside the trailer he was supposed to take back to Buffalo and saw that it was empty. He had keys to the facility, and so he went inside and proceeded to the supervisors' desk. He asked the supervisors if there was anybody to load the trailer, but "they said nobody was available and I was on my own" (Tr. 25). The supervisors pointed to two wire cages, approximately four or five square feet in diameter and three feet high, that were supposed to be taken back to Buffalo. Plaintiff testified that he was familiar with the cages, which were used during the holiday season for heavier bulk and catalogue mailings, but this was the first time he had ever been told that he would have to load the cages himself. He was also aware that power loading equipment was available on the loading dock at the LaSalle Station, but only for use by trained dock handlers. It was not available for use by truck drivers. It occurred to him to call his supervisor at Midwest Transport, Rob Straker, but he decided that "[i]t wouldn't have made no difference. He would have probably told me to go do the best you can." (Tr. 27).

Plaintiff testified that as he began pushing the first heavy wire container across the loading dock floor, he felt a pain shooting down his left side from his stomach area to his groin. He continued to push the container into the trailer on an uphill incline all the way to the front, closest to the driver. He managed to load both wire containers and maneuver them into position, with difficulty. He testified that he continued to work for about five days before reporting the incident, until the pain became too severe. When he reported the incident to Mr. Straker, he was told to go and see his doctor (Tr. 28-30).

On cross-examination, plaintiff testified that on occasion he would help C.C. Cox and other handlers load the mail at the LaSalle Station, but usually they already had the return trailer loaded by the time he arrived. He was shown photographs of wire containers (Exs. 36, 38, 40), but he testified that these were not the same containers he loaded on the day he was injured. The ones he loaded were larger. They were only used during the holiday season, and were usually loaded with an electric tow motor (Tr. 36-41).

Plaintiff testified that he did not voice any complaints to anyone about the loading dock procedures at the LaSalle Station, which required him to turn over his keys to the dock handler upon arrival. He did, however, complain to Mr. Straker on several occasions about the lateness of two other Midwest Transport drivers, which often caused plaintiff to be late (Tr. 44-47).

Plaintiff identified Exhibits 21, 22, and 25 as photographs accurately depicting the LaSalle Station loading dock area. He reiterated his direct testimony that when he entered the loading dock area on the day he was injured, all the lights were off. He observed that the trailer he was supposed to take back to Buffalo was empty. He went inside to the supervisor's desk and spoke to two supervisors. He was unable to identify either of these individuals, although he testified that one was a white male. The supervisors told him no one was available to load the trailer, and he was on his own. They pointed to two wire cages on the loading dock, and told plaintiff those cages needed to go back to Buffalo. He proceeded to load the first wire container into the trailer. About halfway up the trailer, he felt a sharp pain. He stopped to compose himself, and then continued to push the container to the front of the trailer. He also went back and loaded the second cage on his own. He did not stop to ask for help, either from USPS personnel at LaSalle or from his

supervisor at Midwest Transport, because he was told by the supervisors that no help was available. He was also under time constraints to get the mail back to Buffalo at the risk of losing his job (Tr. 49-64).

## 2. C.C. Cox

Mr. Cox was employed by the USPS for more than 29 years. He worked as a Mail Handler at the LaSalle Station from April 2001 until October 31, 2005, when he went on sick leave. He retired on March 30, 2006 (Tr. 66-69).

Exhibit 4 is a printout of Mr. Cox's work attendance sheet for the period October 10 through October 28, 2005. It indicates that he worked his regular hours (9:15 a.m.– 6:45 p.m.) on Monday, October 17 through Thursday, October 20, and he took annual leave on Friday, October 21. Mr. Cox testified that during that time he and other USPS employees, identified as Steve Simpson, Janine Egloff, and Mary Kowalski, regularly loaded the Midwest Transport trailer which was scheduled to depart from the LaSalle Station at 1:35 p.m. It was primarily Mr. Cox's job to load the mail onto the trailer. If he was not there, management would assign another USPS employee to do it. It would not be appropriate procedure to allow the driver to load the mail himself. Nor would it be appropriate to allow the driver to use the mechanical loading devices, which were only available for use by qualified USPS personnel. Mr. Cox used the mechanical devices regularly to load heavy items, primarily "skids" without wheels (Tr. 69-74).

The normal routine for the 1:15 p.m. truck from Buffalo/Grand Island gave the driver approximately 20 to 25 minutes to drop off the inbound trailer and pick up the outbound trailer. After the driver arrived and properly positioned his tractor, he came into the loading

dock area, turned over his keys to Mr. Cox, and waited for permission to back in to the dock in order to leave the trailer he brought and pick up the load Mr. Cox had prepared for transport to Buffalo. In all of his years with the Post Office, Mr. Cox never told a driver to load the mail himself (Tr. 75-77).

On cross-examination, Mr. Cox testified that the wire containers depicted in Exhibits 36, 38 and 40 were the largest containers available at the LaSalle Station during the relevant time period. These containers were used for parcel post, Priority Mail, or whatever mail was placed in the containers by the clerks on the line. Magazines were not placed in this type of container. Mr. Cox was responsible for bringing these containers to the dock area to be loaded on the trailers. He testified that when fully loaded, the containers weighed less than 2,000 pounds. If there was a manual lift or a manual pump jack available on the loading dock in October 2005, drivers were not authorized to use it (Tr. 78-80).

Mr. Cox testified, and his time and attendance records confirm, that when he was on duty, he was always present for dispatch of the 1:15 p.m. Midwest Transport truck. According to Mr. Cox, plaintiff did have a problem with the safety rule which required the truck driver arriving at LaSalle to turn over his keys to the dock handler after parking his truck. This rule was necessary because of past incidents involving drivers who left the dock without the truck properly configured or the doors properly positioned. Mr. Cox testified that plaintiff never wanted to turn over his keys, and they had several confrontations about this issue (Tr. 80-84).

### 3. John Sullivan

Mr. Sullivan worked for the Post Office for 31 years. He was acting manager in charge of the LaSalle Station from December 2005 until his retirement in April 2009. According to Mr. Sullivan, it was the Mail Handler's job to load the mail onto the trailers, and to his knowledge no drivers from Midwest Transport were ever told they had to load their own trucks. It would be inappropriate to do so for safety and policy reasons (Tr. 86-88).

On cross-examination, Mr. Sullivan testified that he was aware of the time schedules in the contract between the USPS and Midwest Transport, but not the particular terms regarding the parties' rights and responsibilities. When he started working at the LaSalle Station in December 2005 (after the incident at issue), there was manual and motorized lift equipment on the loading dock. Truck drivers were authorized to use the manual equipment, but not the motorized equipment due to OSHA regulations. He testified that he did not observe Midwest Transport drivers loading trailers alongside USPS Mail Handlers as a common practice, but he occasionally saw a driver collect express mail bags and put them on the truck (Tr. 89-90).

### 4. Steven Simpson

At the time of trial, Mr. Simpson was the Business Mail Entry Unit ("BMEU") Clerk at the LaSalle Station. He held that position at the time of the events at issue. As confirmed by his attendance/time sheets (Ex. 7), he was at work every day on Monday, October 17 through Friday, October 21, 2005, and was present and available on those days at the time of arrival and departure of the 1:15 Midwest Transport truck. He

sometimes assisted the Mail Handlers with loading the trucks if C.C. Cox was unavailable, or if he was asked to do so by the supervisor, and he testified that plaintiff also helped with the loading on some of those occasions. Mr. Simpson identified the items depicted in Exhibits 36, 38 and 40 as "wiretainers," which are used to transport parcels or packages, not magazines. If a wiretainer is damaged, an orange tag is attached signifying that the container is not to be used (Tr. 94-101).

Mr. Simpson testified that the Business Mail Entry Unit accepts mail from 8:30 a.m. to 4:30 p.m., and is always staffed with at least one person during normal business hours. He could not recall an occasion when the lights on the loading dock were out, nor did he ever get a report that the lights were out. He was aware plaintiff had a problem with turning over his keys to C.C. Cox, and that it seemed like plaintiff was always in a hurry to leave before Mr. Cox released him (Tr. 102-03).

Mr. Simpson testified that from time to time, plaintiff would come into his office and ask to have someone load the mail onto his truck. Mr. Simpson confirmed that he gave deposition testimony indicating that power jacks were available on the loading dock to help load heavy wire containers in a manner similar to a forklift, and that plaintiff was not authorized to use the mechanized equipment (Tr. 103-08).

**5. Janine Egloff**

Ms. Egloff worked at the LaSalle Station as Bulk Mail Technician at the time of the events at issue. Her duties included taking care of bulk mailings for customers, such as nonprofit organizations. Her office was in a separate room near the loading dock, and was open from 8:30 until 4:00 Monday through Friday. Steve Simpson and Mary Kowalski also

worked in the Bulk Mail office at the time.  Loading mail onto trailers was not part of Ms. Egloff's official duties, but she would help load the trailers if requested to do so by her supervisor when the Mail Handler was off duty and no other handlers were available to cover the shift (Tr. 115-18).

Ms. Egloff testified that plaintiff came into her office on occasion to look for Mr. Cox, or to inquire about whether the mail had been loaded onto the trailer.  She said it would be unusual if, when plaintiff arrived at the loading dock at 1:15 p.m., all of the lights were off and nobody was around.  As confirmed by the attendance/time records, Ms. Egloff was at work every day during the week of October 17-21, 2005, and she was present in the Bulk Mail office and available to assist with loading the 1:35 p.m. Midwest Transport trailer on those days if needed (Tr. 118-22).

Ms. Egloff testified that employees at the LaSalle Station referred to plaintiff as "Fast Eddie" because he always seemed to be in a hurry to make the trailer turnaround.  Ms. Egloff was familiar with the wire containers, or "wiretainers," depicted in Exhibits 36, 38, and 40.  She testified that these containers were in use at the LaSalle Station during the relevant time period, and she had occasionally loaded one of them onto a Midwest Transport truck by pushing it.  Typically, these containers were used to transport Priority Mail, including parcels and large envelopes called "flats" (Tr. 123-25).

Ms. Egloff testified that there were times when plaintiff arrived at the loading dock and the mail had not already been loaded onto the trailer bound for Buffalo.  She indicated that since someone was usually present at the Bulk Mail office, it would have been much quicker for plaintiff to stop there and ask for help rather than going directly to the supervisor's desk inside the facility.  She could not remember one instance where a truck

driver was compelled to load the mail onto the trailer by himself because the loading dock was unoccupied. She testified that the Bulk Mail office was closed on Saturdays and that, hypothetically, there might be an occasion when a driver arrived on a Saturday and there was no one present on the loading dock or in Bulk Mail to help him load the trailer (Tr. 126-31).

**6.    Brendan Shea**

At the time of the trial, and at the time of the events at issue, Mr. Shea was the Supervisor of Customer Service at the LaSalle Station. His duties included supervision of the loading docks and Mail Handlers, including C.C. Cox. According to Mr. Shea, under the contract between the USPS and Midwest Transport, it was the truck driver's duty to take the mail from the loading dock and load it onto the truck. Mr. Shea stated that he came to this understanding from reading the contract as part of his review of the Mail Handler's duties in light of the diminishing workload at the LaSalle Station. According to Mr. Shea, although it was common in October 2005 for C.C. Cox or other available USPS personnel to help the driver load the mail onto the Midwest Transport trailer if the load was heavy or time was short, it was not the duty of USPS employees to do so (Tr. 132-35).

Mr. Shea testified that he also supervised the operation of the BMEU and its staff. In 2005 the unit was staffed by Janine Egloff, Steve Simpson, and Mary Kowalski, and operated from 8:30 a.m. to 4:00 p.m. Monday through Friday. The unit was always fully staffed to handle incoming customers, as well as test mailers for performance ratings (Tr. 135-36).

Mr. Shea testified that he first heard about the accident involving plaintiff when defense counsel contacted him to testify at a deposition. According to the attendance records, Mr. Shea was present and working at the LaSalle Station each day from 5:00 a.m. to 2:00 p.m. on October 19-21, 2005. As supervisor, if the loading dock and BMEU lights were out at 1:15 p.m. on a day he was working he would know about it, and he could not recall that this was ever the case during the month of October 2005. He never heard of a supervisor telling a driver there was no one available to help load the mail, and he would never make such a statement because he would get in trouble if any mail was left unloaded. If a Mail Handler was scheduled for a day off, Mr. Shea would provide for somebody to cover the Mail Handler's duties (Tr. 136-39).

Mr. Shea identified the items depicted in Exhibits 36, 38, and 40 as wire containers which were in use at the LaSalle Station in 2005. These containers had large wheels and were pushed to the loading dock after being loaded with parcels at the front window. Common practice and safety rules required that the parcels not be loaded higher than the top of the container. If a container was overloaded, the mail would be placed into another container to make sure the parcels were not damaged by falling out. These containers were not used for magazines or catalogs. If a wire container was defective or not working properly, it was taken out of service and a red tag was placed on it until it was fixed (Tr. 140-43).

Attendance records reflected that USPS employees Mark Kowalski and Kim Ciurczak were present at the LaSalle Station on October 19-21, 2005, and were available on those days to help load the 1:15 p.m. Midwest Transport truck (Tr. 143-47).

On cross-examination, Mr. Shea testified that he did not read the entire highway contract, only the three pages that related to his job as supervisor. He told Mr. Cox it was not the Mail Handler's responsibility to load the trucks, but Cox just kept doing it anyway. According to Mr. Shea, Mr. Sullivan–the station manager, and Shea's boss–was wrong when he testified that it was C.C. Cox's responsibility to load the Midwest Transport trucks. Mr. Shea stated that neither C.C. Cox, Janine Egloff, nor any of the other USPS employees who testified in this case should have loaded the mail onto plaintiff's truck. In Mr. Shea's view, LaSalle employees were there to help plaintiff if he needed it, but if no one was available he would have to load the mail on his own (Tr. 148-53).

## 7.    Robert Straker

Mr. Straker began working for Midwest Transport in 1997. At the time of trial, he held the title of Northeast Regional Safety and Operations Manager. In October 2005 he held the title of Terminal Manager, overseeing basic operations in Midwest Transport's Buffalo, Rochester, and Jamestown terminals. He was plaintiff's direct supervisor (Tr. 156-57).

Exhibit 15 is a copy of Midwest Transport's Driver's Safety Manual. Mr. Straker testified that this manual is considered to be the employee handbook, containing the terms and conditions of employment as well as safety and operational information, and all Midwest employees were expected to read it and be familiar with its basic contents. Plaintiff received a copy of the manual when he was hired in July 2003 (*see* Ex. 14). The manual states that, as required by the Workers' Compensation law, a driver who is injured

on the job must immediately report the injury to his supervisor.  According to Mr. Straker, plaintiff did not notify him about the injury until six days after it happened (Tr. 157-61).

The Driver Safety Manual contains a section from a USPS employee handbook entitled "Highway Contractor Safety" (Ex. 15, pp. 83-126), which requires employees handling mail containers to be guided by common sense and, if a container is particularly heavy, to get help.  Mr. Straker testified that if a Midwest Transport employee was required to handle a container that was too heavy for him to load on his own, he would expect the employee to first contact someone on the loading dock; and if no one was available, he would expect the employee to contact him.  According to Mr. Straker, this has happened on several occasions at an unmanned postal station in Olean, New York, when the driver called and was instructed to wait for someone to get to the facility to help unload the trailer. He testified that plaintiff was made aware of these requirements by means of regular staff safety meetings and frequent conversational reminders.  He also instructed plaintiff and other Midwest Transport employees about what to do if they were injured at work (Tr. 161-64).

Mr. Straker testified that plaintiff often complained to him about the lateness of other Midwest Transport drivers as it affected his turnaround schedule at the LaSalle Station. Plaintiff kept a spreadsheet showing how late the drivers were running on each particular day, and regularly gave Mr. Straker a copy.  Mr. Straker informed plaintiff that he had discussed the matter with the other drivers and was told that they were also operating within a time frame with other facilities and would get the mail to LaSalle as soon as they could in a safe manner, but plaintiff continued to keep time records for the other drivers (Tr. 164-65).

Exhibit 9 is the "First Report of Injury" form filled out and signed by plaintiff. Mr. Straker also signed the form, which is dated October 31, 2005. It indicates that the injury occurred on Wednesday, October 19, 2005, at 1:15 p.m. As reflected in plaintiff's time sheets (Ex. 11), plaintiff worked full shifts on October 19 (Wednesday), 20 (Thursday), 21 (Friday), 22 (Saturday), 24 (Monday), and 25 (Tuesday). Mr. Straker testified that plaintiff reported the accident to him on Tuesday, October 25. At that time, plaintiff was walking with a bit of a limp and was a little hunched over, but he went back to work and completed his shift for that day (Tr. 165-70).

On cross-examination, Mr. Straker was shown Exhibit 47, which is a document entitled "OSHA's Form 301 Injury and Illness Incident Report" dated October 27, 2005, and filled out by Delena Higginbotham, who handles worker's compensation matters for Midwest Transport. This form also indicates that plaintiff's injury occurred on October 19, 2005. Mr. Straker testified that on October 25, when plaintiff first reported his injury, he told Mr. Straker that the accident happened on Thursday, October 20 (Tr. 170-75).

Mr. Straker testified that plaintiff was an excellent employee with whom he never had any problems. He characterized plaintiff's reporting on the lateness of other employees as helpful, and he did not criticize him for doing so. He testified that, depending on the particular circumstances, he would expect a driver confronted with an unusual situation to exercise the discretion to handle the situation on his own, without the need to call his supervisor (Tr. 175-80). He testified further that, although the employee handbook does not explicitly instruct an employee to call his supervisor before taking action against his best interest, that situation was addressed at safety meetings (Tr. 186-87).

-16-

In his post-trial submission, plaintiff argues that the testimony and exhibits presented at trial establish the government's liability for negligence by a preponderance of the evidence. Plaintiff contends that by failing to provide him with assistance in loading the heavily laden wire containers onto the Midwest Transport trailer on the particular occasion in question, the USPS breached a duty of reasonable care recognized under the law which proximately caused the injuries alleged in the complaint.

The government argues that: (1) the USPS owed no reasonable duty of care to plaintiff to assist him with loading the mail; (2) even if the court finds such a duty existed, the USPS did not breach the duty; (3) even if the court finds a breach of duty, plaintiff has not established that the breach was a proximate cause of his injuries; and (4) even if the court finds negligence on the part of the USPS, New York's comparative negligence statute precludes recovery of any damages because plaintiff was entirely responsible for his injuries.

## CONCLUSIONS OF LAW

Pursuant to the Federal Tort Claims Act, the federal government has consented to be sued for the negligent or wrongful acts or omissions of its employees acting within the scope of their employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). "Under the FTCA, the liability of the United States for the negligent acts of its agents is governed by the law of the state in which the alleged negligence occurred." *Ford v. United States*, 2000 WL 1745044, at *4 (S.D.N.Y. Nov. 27, 2000). Thus, in order to establish the government's liability for

negligence in this case, plaintiff must show by a preponderance of the evidence that: "(1) the defendant owed the plaintiff a cognizable duty of care; (2) the defendant breached that duty; and (3) the plaintiff suffered damage as a proximate result of that breach." *Stagl v. Delta Airlines, Inc.*, 52 F.3d 463, 467 (2d Cir.1995) (citing *Solomon v. City of New York*, 66 N.Y.2d 1026, 1027 (1985)); *see also Williams v. Utica College of Syracuse University*, 453 F.3d 112, 116 (2d Cir. 2006).

## 1. Duty

"[A] a duty of reasonable care owed by a tortfeasor to an injured party is elemental to any recovery in negligence." *Palka v. Servicemaster Management Services Corp.*, 83 N.Y.2d 579, 584 (1994). As recognized by the Second Circuit, "[t]he existence of a duty is thus a *sine qua non* of a negligence claim: 'In the absence of a duty, as a matter of law, no liability can ensue.'" *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d. Cir. 2000) (quoting *McCarthy v. Olin Corp.*, 119 F.3d 148, 156 (2d Cir. 1997)). The question of the existence and scope of an alleged tortfeasor's duty "is, in the first instance, a legal issue for the court to resolve." *Waters v. New York City Hous. Auth.*, 69 N.Y.2d 225, 229 (1987), *quoted in Alfaro*, 210 F.3d at 114.

The government contends that plaintiff's negligence claim fails at the outset of this inquiry because plaintiff cannot demonstrate a legally cognizable duty of reasonable care on the part of the USPS to assist with the loading of the mail at the LaSalle Station. According to the government, the Transportation Services Contract specifically delegated the responsibility "to load, transport, and unload all classes of mail at the headout, en route, and destinating offices" to Midwest Transport, allowing Post Office personnel to

assist with loading and unloading only as necessary "to maintain schedule." Ex. 44 at §
B.1.4, p. 3702.

The court's review of the pertinent case law reveals that while contractual delegation
of specific duties as among the parties to a negligence claim may indeed be a pertinent
factor in the court's determination of the existence and scope of an alleged tortfeasor's
duty of reasonable care, it is not ordinarily a controlling factor. Rather, identifying duty
"coalesces from vectored forces including logic, science, weighty competing socioeconomic
policies and sometimes contractual assumptions of responsibility. These sources
contribute to pinpointing and apportioning of societal risks and to an allocation of burdens
of loss and reparation on a fair, prudent basis." *Palka*, 83 N.Y.2d at 585 (citing cases).
Thus, in analyzing questions regarding the existence and scope of an individual actor's
duty:

> the courts look to whether the relationship of the parties is such as to give
> rise to a duty of care, whether the plaintiff was within the zone of foreseeable
> harm and whether the accident was within the reasonably foreseeable risks.
> The nature of the inquiry depends, of course, on the particular facts and
> circumstances in which the duty question arises. The analysis is also driven
> by considerations of public policy. As we stated in *Waters v. New York City
> Hous. Auth. (supra*, at 229), "[t]he common law of torts is, at its foundation,
> a means of apportioning risks and allocating the burden of loss."

*Di Ponzio v. Riordan*, 89 N.Y.2d 578, 583 (1997) (other citations omitted).

It is well settled in New York that a landowner, including the federal government as
owner of a postal facility, has a general duty to "'exercise reasonable care to maintain its
premises in a safe condition in view of the circumstances . . . .'" *Robinson v. United States*,
330 F. Supp. 2d 261, 287 (W.D.N.Y. 2004) (quoting *Michalski v. Home Depot Inc.*, 225
F.3d 113, 117 (2d Cir. 2000)); *see also Basso v. Miller*, 40 N.Y.2d 233, 241 (1976).

-19-

The nature and scope of that duty and the persons to whom it is owed require consideration of the likelihood of injury to another from a dangerous condition on the property, the seriousness of the potential injury, the burden of avoiding the risk and the foreseeability of a potential plaintiff's presence on the property.

*Galindo v. Town of Clarkstown*, 2 N.Y.3d 633, 636 (2004), *quoted in Furey v. United States*, 458 F. Supp. 2d 48, 53 (N.D.N.Y. 2006).

In this case, notwithstanding the specific delegation of work requirements and responsibilities in the Transportation Services Contract, the testimony and evidence presented at trial clearly establish that C.C. Cox and other USPS employees undertook the duty to load the mail onto Midwest Transport trailers at the LaSalle Station on a regular basis during the relevant time period. Mr. Cox testified that it was his job as Mail Handler to load and unload the mail trucks, and that he performed this task for the Post Office for many years. Mr. Cox's understanding of his job duties is confirmed by the USPS "Standard Position Description Mail Handler MH-04," which specifies "load[ing] mail onto trucks" as the responsibility of the Mail Handler (Ex. 45). The USPS provided mechanical equipment at the LaSalle loading dock, which Mr. Cox testified he regularly used to load heavy items. However, plaintiff was not permitted to use this equipment. Wire containers such as the ones plaintiff loaded onto his trailer in October 2005 were known to have the capacity to weigh up to 2,000 pounds when fully loaded. Under these circumstances, the reasonable inference can be drawn that neither the USPS nor Midwest Transport expected the truck driver to load heavy items onto the trailer without assistance.

Brendan Shea, Mr. Cox's supervisor, testified that he understood the contract between USPS and Midwest Transport to require that the Midwest drivers were responsible for loading and unloading their trailers, and he had reminded Mr. Cox of this requirement

on several occasions. However, Mr. Shea's supervisor John Sullivan, who was the manager of the LaSalle Station and was responsible for overall operations, testified that it was the Mail Handler's job to load the mail onto the trailers, and it would not be appropriate procedure or policy to tell a Midwest Transport driver that he had to load his own truck. Mr. Cox testified that it had always been his job to prepare the outbound trailer for departure by loading the mail onto the trailer himself; and if he had the day off, management would assign another USPS employee to do it. He also testified that it would not be appropriate to allow the driver to load the mail without assistance; and that in all of his years working as a Mail Handler on the loading docks, he had never told a driver to load the mail himself.

Based on all of these circumstances, it was reasonably foreseeable that a person in plaintiff's position would be likely to sustain serious injury if left to his own devices to manually push a heavily loaded wire container onto the trailer in order to maintain his work schedule, given defendant's minimal burden to make sure a Mail Handler, Bulk Mail Clerk, or some other appropriate personnel was available at the regularly scheduled time to provide assistance. Accordingly, the court finds as a matter of law that the relationship of the parties under the circumstances gave rise to a duty of care on the part of the USPS to maintain the loading dock at the LaSalle Station in a reasonably safe condition, and that the scope of this duty included the obligation to make sure a Mail Handler or some other USPS employee was available at the regularly scheduled dispatch times to provide appropriate assistance to plaintiff to enable him to safely observe his delivery schedule. The court also finds that the injury suffered by plaintiff was within the zone of reasonably

foreseeable harm that might occur if no one from the Post Office was available at the regularly scheduled times to help him push a heavily laden wire container onto his trailer.

## 2. Breach

Having found that the USPS had a duty of reasonable care to assist plaintiff with the task of loading heavy wire containers of mail onto his trailer at the LaSalle Station, the court must determine whether plaintiff has demonstrated by a preponderance of the evidence that the USPS breached this duty by failing to provide him with appropriate assistance on the day of the incident which caused his injury.

In this regard, plaintiff alleged in his complaint that the injury occurred at 1:15 p.m. on Wednesday, October 19, 2005. This same date of occurrence was consistently reported in several documents entered into evidence in the case, including the Midwest Transport First Injury Report dated October 31, 2005 (Ex. 9); the OSHA Form 301 dated October 27, 2005 (Ex. 47); and the administrative Claim For Damage, Injury, Or Death (Form SF-95) dated May 31, 2007 (Ex. 10).[4] However, at trial plaintiff could not recall the specific date on which the injury occurred, referring instead to "the week of the 19th" (Tr. 25). He testified that the only thing he knew for sure was that the injury occurred on a day when no one was there to load the mail, and he had to do the work himself (Tr. 31).

Considering as a whole the evidence presented at trial, the issue regarding the actual date on which the incident occurred takes on material significance for the court, as trier of fact, in determining whether defendant breached the duty of reasonable care it

---

[4]The same date of occurrence was reflected in Plaintiff's Responses to Defendant's First Set of Interrogatories, Interrogatory No. 3, which was submitted to the court as Joint Exhibit 20, but was not separately filed, marked for identification, or admitted into evidence at trial.

owed to plaintiff. As outlined above in the summary of the trial testimony, and as reflected in the attendance records (Exs. 3-7), several LaSalle Station employees were at work on Monday, October 17 through Friday, October 21, 2005, and were generally available to assist with the loading of the Midwest Transport trailer scheduled for departure at 1:35 p.m. on each of those days. C.C. Cox took a leave day on Friday, October 21, but both Janine Egloff and Steve Simpson were present in the Bulk Mail office that day and were available to assist with loading the 1:35 p.m. Midwest Transport trailer, as they had done in the past. These employees also consistently testified that both the loading dock and Bulk Mail office were open, fully lighted, and adequately manned at 1:15 p.m. on each of those days, and that at no time would two heavily laden wire containers ever be left at the loading dock for the Midwest Transport driver to maneuver onto his trailer by himself.

During cross-examination, and in his post-trial submission, plaintiff's counsel alluded to the fact that none of the USPS employees who testified at trial was working on Saturday, October 22, 2005, a day on which plaintiff worked a full shift. In addition, there was testimony that the Bulk Mail office was closed on Saturdays, and that it would be possible for a Midwest Transport driver to have arrived at the LaSalle Station on a Saturday when no one was present on the loading dock or in Bulk Mail to help him with wire containers which had not yet been loaded onto the return trailer. Although not specifically pleaded or directly argued, this evidence could be viewed as sufficiently consistent with plaintiff's testimony to give rise to an inference that the incident and injury occurred on Saturday, October 22, 2005, when it was at least conceivable that no one was around when he arrived, all the lights were off, and the mail was not loaded on the return trailer.

However, plaintiff did not call any witnesses to provide an independent, first-hand account of events that might have taken place at the LaSalle Station on October 22nd, nor did he otherwise offer any proof to support the inference that the incident actually occurred on that day.  Rather, the preponderance of the proof that was presented at trial indicates otherwise.  Plaintiff himself testified that he worked at least five days after the day on which he was injured, and the attendance records in evidence indicate that his last day of work was Tuesday, October 25, 2005,[5] the day he reported the incident to Mr. Straker and was told to go and see a doctor.  Mr. Straker's testimony was consistent with these facts.  In addition, the "First Injury Report" and "OSHA Form 301" admitted in evidence were completed in October 2005, shortly after the incident occurred, and the date of injury reported on those forms is October 19–the same date of occurrence alleged in both the administrative claim and the federal court complaint.  This evidence could be viewed by a rational trier of fact as ample support for the conclusion that the injury complained of in this case occurred on the date and time that it was consistently reported and pleaded–during the 1:15-1:35 p.m. turnaround on October 19, 2005.  Indeed, the record before the court clearly reflects that this litigation proceeded through the discovery, mediation, settlement, motion practice, and trial preparation stages based upon the underlying assumption that the injury occurred on the date alleged in the complaint.  To allow plaintiff to assert for the first time at trial that his injury actually occurred on a date when none of the USPS employee witnesses called by either party to testify was working, and might have observed

---

[5]Plaintiff's payroll time sheet records indicate that he worked three days in December 2005, and at some point thereafter was "pulled from [his] truck" and "went to 100% disabled" (Ex. 11).

events relating to the incident, would result in substantial prejudice to the defense on the merits and cannot be countenanced by the court.

In addition, plaintiff testified that when he approached the supervisor's desk on the day of the incident, there were two supervisors on duty who told him he was "on his own." However, neither of these individuals was ever identified, and no witness was called by plaintiff to support his version of the events that transpired that day. Mr. Shea, the only employee identified as a "supervisor" who testified at trial, stated that he had never heard of a supervisor telling a driver there was no one available to help load the mail, and he would never make such a statement himself. Similarly, Mr. Sullivan, the Station Manager who at the time of trial was in charge of overall operations at the LaSalle Station, testified that it would be inappropriate for safety and policy reasons to tell Midwest Transport drivers that they had to load their own trucks, and to his knowledge no drivers had ever been told to do so.

In the end, the only evidentiary support for plaintiff's version of the events leading to the injury complained of in this case is his own self-serving testimony. As clearly indicated by the court's summary of the testimony and exhibits presented at trial, the considerable weight of credible evidence shows that the loading dock at the LaSalle Station was open for business at 1:15 p.m. on Monday through Friday, October 17 -21, 2005, and was adequately staffed with USPS personnel familiar with the procedures for loading heavy wire containers of mail and available upon request to help load the Midwest Transport trailer regularly scheduled to depart for Buffalo at 1:35 p.m on each of those days. The only plausible conclusion to be drawn from this evidence is that plaintiff's testimony, standing alone, is insufficient to establish that the USPS at any time breached

its duty to plaintiff to maintain a reasonably safe workplace by failing to provide staff or equipment to help him load heavy wire containers full of mail onto his trailer.

Based upon this review of the totality of the testimony and exhibits presented at trial in light of the pertinent legal standards, the court finds that plaintiff has failed to meet his burden to show by a preponderance of the evidence that the USPS breached its duty of care to maintain a reasonably safe workplace at the LaSalle Station by failing to provide appropriate assistance in loading the mail onto the Midwest Transport trailer at the regularly scheduled dispatch time on the date alleged. Accordingly, plaintiff has failed to establish liability for negligence on the part of the government, and his FTCA claim must be dismissed.

## CONCLUSION

The foregoing constitutes the court's findings and conclusions after trial, in accordance with Rule 52(a). The Clerk of the Court is directed to enter judgment in favor of defendant, pursuant to Rule 58.

So ordered.

/s/ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated: October  12  , 2010
p:\opinions\07-826.oct42010

-26-